at all. I'd like to reserve three minutes for my rebuttal. Yes, three minutes. Good morning, Your Honors. May it please the Court. I'm Jeremy Friedman. I'm representing the relator, Ken Jones. In this case, Dr. Jones is in the courtroom. Mr. William Hughes is my co-counsel at counsel's table. It's a unique and special honor for me to return to the Court on this case. The primary issue that I'd like to address today is whether there's undisputed proof that there were knowing false statements in the NIH grant application for scientific research, such that the United States is entitled to judgment as a matter of law. There are four issues of fact that are undisputed that I'd like to address today. The first is that there was two sets of data being used in this study, two sets of inconsistent data. One set with Achilliani's original drawings was used to establish the reliability of the methods, drawing a Pearson correlation of 0.96, which is excellent. And then the second set of data, where substantial changes were made to a select few normal subjects, was used to produce the results, which showed that the defendants could supposedly predict who would convert to Alzheimer's disease with 93 percent accuracy. It's unquestionable that it's a falsehood to use two sets of data that are diametrically opposed. To some extent, the premise of your argument seems to be that in order to allow the jury to reject the expert had to present contrary expert testimony. They chose not to do that. They relied instead on the defendants and an apparent attempt to discredit Dr. Jones. Is that your premise, that there had to be contrary expert testimony if the jury was to reject testimony of your experts? In the context of this case, yes, Your Honor. As your 51-page opinion in this prior appeal shows, this case turns on expert testimony. And you cannot understand where there is or isn't falsehoods unless you have expert testimony on it. And we had submitted expert testimony that this court found relevant and substantiates proof. It would be unreasonable for a jury, a reasonable jury would not reject expert testimony from a neutral expert who is qualified as an expert in the case on the basis of their own thoughts without guidance from some sort of counter-expert. In fact, in this case, there was counter-expert that Judge Lopez, your earlier decision went through directly. Dr. Sakin, at a time of trial, Dr. Sakin agreed with the relator. Yeah, but counsel, it's one thing for a judge considering a summary judgment motion to disregard or not properly treat contrary expert testimony, but arguably it's a different proposition for jurors, who are the ultimate fact-finders, to make a judgment about the persuasiveness of expert testimony that is provided by a plaintiff in light of the contrary evidence provided by defendants, even in the absence of expert testimony. I don't know where the proposition comes from that in the absence of expert testimony, the jurors could not make a judgment about the factual disputes here in light of the testimony that the defendants themselves were presenting. Well, the defendants themselves didn't testify to the key issues that our experts did testify to. Our experts reviewed the various tracings and gave testimony that there was no justification for the revised tracings and that the tracings departed from the agreed protocol. What Dr. Kiliani testified to at trial was his intentions. He did not review all of the different tracings that had been altered and did not offer any evidence that contradicted what the expert testimony was. What the defendants end up relying upon before this court is not whether or not there's falsity. It's whether or not they had intent to defraud, and that's what they were hoping the jury would come to, not that they would reject what Dr. Shuff and Dr. Goldstein had found without contradiction. And the defendants have their own experts that they could have called, and they didn't call them because they agreed with our experts. Well, isn't a critical issue was whether Dr. Kiliani was blinded when he did the retracings. Now, he has insisted throughout that he was. Isn't that correct? Well, it's funny, Your Honor. He insisted that he was blinded to the ultimate status, but he did not insist, as he couldn't, that he was blinded to status at baseline. He admitted he had the records that showed a code 06 for everybody who was normal at baseline and 07 that was everybody who was questionable at baseline. His testimony at court was that he didn't understand the 06 meant normal. But what he was testifying throughout trial and what he said to this court in the first appeal was that he was blinded to ultimate status, and that was a misleading of us and misleading of the court. This case doesn't turn on password protection of ultimate status of clinical information. It turns on modifications to the subjects who were normal at baseline. And, Your Honor, whether or not he was blinded or not is an important issue, but it's not the critical issue. It's one of the four issues that I was going to address today that would show falsity. But is the jury entitled? Would a reasonable jury be entitled to believe Dr. Kiliani that he was blinded, despite all of our evidence? And our proposition on that is no. The statistical probability of Dr. Kiliani being blinded and making the changes that he did was .8 in 1 million, or 8 in 10 million. And under the civil standards of preponderance of evidence and under the rules, Rule 50, which mirrors Rule 56, that is insufficient on the balance of evidence to say that he, in fact, was blinded. His testimony, I didn't know what 06 meant, is insufficient as a matter of law to preclude a finding that he was, in fact, not blinded. But that's only one issue, and I think we want it. The other three issues, there's just no question about it. There was a departure from protocol. There was two sets of data. When you use two sets of data, you might have an argument over, was one set of data good? Was the other set of data bad? But to put two sets at the same time, you're saying, I'm trying to measure this part of the brain and it's really small, or maybe it's a little bigger, but it can't be both. And that's what they did in their study. They had two sets of data. They put them both in their study to show as if it could be both at the same time. The third thing is the reliability statistic. There's no doubt and there's no dispute put forth by any of the defendants that if you take the data that was changed and you put it back into the formula to calculate reliability, you get a Pearson correlation of 0.54, not 0.96. And that is a substantial difference. And every witness who testified in court, including Dr. Sagan who didn't testify in court, said that a 0.54 is not significant and you couldn't use that as a reportable result. So the four issues that are before the court, the four factual issues that I'm presenting to the court are all undisputed and it's based upon expert testimony, but it's also based on the fact that there was nothing to oppose this by the defendants. I think you'll hear from my brother that the evidence goes to Dr. Kiliani's intent. He didn't intend to do bad. And there's substantial briefing on Dr. Albert, Marilyn Albert's knowledge, which I'd be happy to address as well. Dr. Albert certified that every statement was true, complete, and accurate. She acknowledged her obligation as the principal investigator to know the truth of the data before she submitted it. She admitted that the disclosure by Dr. Jones and Dr. Johnson implicated Kiliani's honesty and that if, in fact, he had made these changes, it would make the application a lie. And there's no dispute that she failed to refer the matter to the research integrity officer. This was required in two ways. Number one, it's required by NIH regulations that the principal investigator refer these matters to an independent research integrity officer, but it's also a matter of partners' policy. And partners has a written policy, which we got produced to us on the first day of trial, and it says specifically that you have to refer these allegations to an independent research integrity officer. Judge Young, on the record, said that there is no evidence of any investigation here. And if the question is what was Dr. Albert's knowledge about this, there's no question she knew that there was a problem. She knew that the integrity had been impugned, and it was her obligation to make sure that the data was true. It was her obligation to refer to the research integrity officer. And Judge Young said there's no evidence of any investigation here. As a matter of law, that meets the CENTER requirements for Dr. Albert as well. With respect to Kiliani, he admits he made these changes. He admits that he was careful when he did this. None of this was by accident. It was all done in the process by which he was drawing up these tracings. And that is why Judge Young also, on the record, but not before the jury, said that there was no basis that anyone was walking away from knowing what was going on here. I think once we come to the conclusion that the statements in the grant application are false, and I think it's inescapable that it is, then the remaining question about whether or not the defendants knew about it or acted with reckless disregard easily follows. I'd like to reserve the rest of the time for rebuttal unless there's a question on these issues. I know you argued. The logic of your position is that you were entitled to judgment as a matter of law. That's the logic of your position, which is an extraordinary outcome that the plaintiff with the burden of proof is entitled in what we would once call a directed verdict. That's pretty extraordinary. It is, Your Honor, on some levels, but not so extraordinary for this case for two reasons. Number one is that we've already had a thorough examination of the information by this court. So this court set forth what the legal standards are and sent us back to a jury trial to see whether or not the defendants had any evidence to counter this. And I think it's an appropriate thing to look at whether or not the defendants had sufficient evidence to counter what this court has already held to be the essential legal standards and sufficient proof on our side. The second reason why it's not that extraordinary is that this is a false claims act case that is brought in the name and on behalf of the United States, and you frequently will find summary judgment motions granted to the government on such cases. This is not a situation where there's any difficulty in determining, especially on the record that was provided in the jury trial, that there were falsities in this case, that those falsities were material. The only possible need for a jury trial would be to determine whether or not it was done knowingly, and on this evidence there's really just no possibility to escape the scienter requirements of the false claims act. May it please the court. Good morning. My name is Alan Rose together with Brian Lipkin. We represent the defendants' appellees here. On this last point about a Rule 50, in essence a directed verdict or as we now call it motion for judgment as a matter of law, there was no motion for judgment as a matter of law directed to the issue of liability made at the trial. The only motion made by relator was an oral motion, which the court said the court would treat as a motion for judgment of law on one issue, the issue of damages, which became irrelevant. The parties stipulated that if, in fact, the questions were answered yes, then the court could go ahead and enter damages, whatever would be called for under the false claims act. So, again, there was no Rule 50A motion directed to the issue of liability, and since there was not, our position is that relator has waived any right to try to claim that under 50B, following a jury trial, that he or the United States is entitled to judgment as a matter of law, notwithstanding the verdict. If I might, I would like to go back to where this court left off at the end of its 51-page opinion back in 2012. At the end of its opinion, the court very precisely set forth the factual issues which the court said needed to be tried. On remand at the trial, the verdict form which Judge Young used captured almost verbatim this court's language at the very end, the very last page of its opinion. Dr. Jones requested that the district court drop the word intentionally, which this court had said should be inserted before the word exaggerated, and the court did make that change. Now, at the charge conference, which was on the morning of the last day of trial, this is at the appendix, pages 1268 to 1274, the court stated that it would tell the jury the implications of the jury's answers to the questions. Now, Jones argues on appeal that question one did not include a reference to Dr. Albert, but Dr. Jones waived this claim. He never complained about the lack of reference to Dr. Albert in question one, either before or after the charge. Furthermore, Dr. Jones fails to explain how Dr. Albert could have been responsible for measurements made by Dr. Killiani. As to question two, the court said at the charge conference that if the jury found no on question one, but then found yes on question two, Killiani would not be liable, but Dr. Albert would be liable. Dr. Jones then objected at the charge conference to this proposed explanation of the ramifications of a yes vote on question two. The court said that if the vote was no on question one, but yes on question two, Dr. Jones said that if the vote was no on one, but yes on two, Killiani should also be liable, meaning in addition to Dr. Albert. But this was completely hypothetical. It's a scenario that never happened. Why? Because the jury came back with a no answer on both questions, and the court was very clear in its instruction with regard to how the jury should go about answering question two, and no objection was taken to the court's explanation as to how the jury should charge with respect to question two. My brother has argued that the evidence essentially was all one way. He seeks either judgment as a matter of law, which we say he has waived. He also filed on June 28, a couple of months after trial, a motion for renewed judgment as a matter of law, a motion for summary judgment, which we say was also waived and not permissible under the Supreme Court's Ortiz case. He also filed a motion for new trial. But the thrust of all these motions is that the evidence went all one way and that the defendants did not offer any contrary evidence. But there was contrary evidence. And looking at the way in which this court chose to frame the issues, it's clear that the defendants' state of mind as to whether or not they had acted knowingly with regard to alleged false statements, the framing of those issues made testimony on state of mind critically important. Dr. Albert testified 290 pages of testimony over parts of five days. Dr. Kiliani testified for almost 200 pages over parts of three days. Dr. Jones himself testified over 290 pages. The judge ruled even-handedly on objections and followed this court's instructions. So what was Dr. Kiliani's explanation of the retracings and whether he was blinded in carrying those out? Well, he clearly testified at, among other places, Appendix 1133. The question was, what information were you given when participants changed groups? He testified, I wasn't given any group information throughout the study. I was unaware if they changed groups that they stayed in the same group. It wasn't part of, it wasn't what I was involved in in the study. So his testimony could not have been clearer that he was blinded throughout the study. And Dr. Albert also testified that she took steps to keep him blinded by not giving him information about who was in the questionable or converter or so-called normal category. Dr. Kiliani testified that as he drew more and more of these boundaries on these very grainy, difficult to read, there are no street signs on these MRI scans. All you see is white matter and gray matter. But what he did was he sat down with Dr. Gomez-Isla. They agreed on a protocol. But if you look at the evidence which is in the record, even with respect to the reliability study, which does show consistency between them, there are still on occasion some dramatic differences in the volumes produced by their two measures. In one case, 50% difference between a drawing that Dr. Gomez-Isla made and a drawing that Dr. Kiliani made. The point of that is two different people applying the same protocol can produce drawings that in turn produce different volumes. And that's absolutely clear if the court will look at the evidence concerning the reliability study. Yes, but the issue here was whether Dr. Kiliani, in doing the retracings, had done them in a way that would allow the predictive conclusion that was so important in the proposal to the National Institute of Health. And you have this expert testimony, which has been summarized here today by opposing counsel, that suggests that you could get such an outcome, a retracing that would allow that kind of predictive judgment to be made. It was virtually impossible that that could be done on a truly sort of random, blinded basis. That was the premise of the expert's testimony, that this couldn't have been done randomly. The premise is faulty. Let me explain. The premise is faulty because Dr. Kiliani didn't purport to be making measurements on a random basis. Rather, he testified he only made re-measurements in instances where he went back, he looked at the initial measurement, and he concluded that the first measurement was too short or too thin. That testimony, by the way, was actually corroborated by Dr. Schoof, who when he reviewed Kiliani's measurements, drawings, concluded that they were either too skinny or too short. And those words appear throughout Dr. Schoof's testimony. So Dr. Kiliani testified that as he did more and more of these, he noticed anatomical variabilities, which caused him in turn to go back and look again at all of his original drawings and where appropriate to do re-measurements. He didn't alter the initial measurements. He did new measurements, which he then sent off to the statistical section where Dr. Jones worked. There was also a computer editing issue, and when the court gets a chance, I wish the court would look at appendix pages 1522 and 1523. This concerns participant number 142 in the study. Dr. Kiliani's original drawing, which is at appendix 1522, because of computer editing, that occurs when you move your cursor on the screen, and when you're coming back on the other side, if the cursor moves too close to where the line was on the other side, the computer, by editing, in this instance, produced a drawing of an entorhinal cortex, which was in two parts, something which is biologically impossible. So naturally, he changed it. And naturally, when he changed it, the volumetric measure produced by that drawing increased by something like 140%. And Dr. Kiliani testified between pages, I think it's 1080 and 1160 of the appendix in this case, with respect to his re-measurement of every single participant's entorhinal cortex in the study that is marked by a red line on the so-called relator's table, where the volume was over a certain amount. I think it was 70%. So if the court, and I'm happy to go through those and give the page references, but Dr. Kiliani testified, and the jury was able to see him. The jury had those scans on the computer screens, which were right in front of them. They could follow along and understand what he was saying when he said things like, my initial drawing missed some of the gray matter. My initial drawing missed, it didn't go as far as the subiculum. It missed some of the white matter. He also testified, for example, that he didn't realize when he first started drawing these MRI drawings that there were instances where the collateral sulcus and the rhinal sulcus could actually merge. He had thought initially they were supposed to be separate. But because of that merger, there were also occasions where occasionally his first measurement missed some of it. So there was substantial contrary testimony to the testimony offered. And as to Dr. Sagan, here's the point about Dr. Sagan. When this case was first filed, there was a broad scale frontal attack on the so-called major finding that was set forth in the grant application, which was whether or not there was predictive value in shrinkage of the entorhinal cortex. And so we had Dr. Sagan ready to testify as to the fact that that has now become accepted scientific fact. But as this court framed the questions, the questions became whether or not Dr. Kiliani intentionally exaggerated the boundaries of the entorhinal cortex in order to prove a hypothesis, and number two, whether or not the statements made in the application about using blinded, reliable methods were false. So the issue about whether or not the major finding was a matter of, you know, scientific fact accepted generally these days was no longer an issue. And we also believe that given the emphasis on state of mind, it was crucially important for the jury to, you know, believe our clients. Counsel, given all of that and given the importance of the state of mind of the defendants, what was the relevance of Dr. Jones's state of mind? Now he was, yes, he was put on to testify, to provide some account of how all this came about and his concerns, but what does his motivation, and this relates to some evidentiary rulings that the appellants have raised. You seem to have made a determination to make Dr. Jones the issue in this case, and so you raise questions about his motivation, what he might financially gain. There were questions about whether he was acknowledged as a joint author of a study and so forth. What does that have to do with those two issues that were presented to the jury? Well, Dr. Jones presented himself as someone who rather vehemently protested and repeatedly told Marilyn Albert that he had concerns about the second measurements, and he said that he repeatedly made those concerns until a point in time when she essentially ordered him to stop talking about it. He also testified that he had done an analysis which produced a reliability study of a coefficient of .54, but the evidence was that he never gave that information to anybody. So we think that there was a strong reason for the jury to hear testimony about his motivation. He presented himself as a whistleblower who was fired from the study because he blew the whistle. Well, the evidence showed that he was not a whistleblower who was fired because he had complained about the measurements. Rather, he was ultimately let go from this study because the NIH itself concluded, and this is in the record, that the biggest single problem with the grant application was the lack of attention to a particular statistical method, which Dr. Jones had told an NIH reviewer he thought was a completely inappropriate way of conducting the study. So I do think that there was strong reason to challenge Dr. Jones's credibility until the point, Your Honor, where you raised the question about this. I've been relying exclusively on the countervailing testimony that we offered by Dr. Kalyani, and of course Dr. Albert also testified at great length, a couple of hundred, 290 pages, about the way in which she responded to Dr. Jones's statement of his concern. She testified that she thought that she was following the policy by involving Dr. Moss, a noted neuroanatomist who worked over at Boston University who reviewed Dr. Kalyani's re-measurements and concluded that in all but one instance the new measurements appeared to be more accurate than the initial measurements. Thank you, counsel. I'd like to address the waiver issues and then the substantive issues. On the waiver issue, my brother cites Ortiz. I'm surprised he has yet to respond to the things that we put in our briefs. Ortiz stands for the proposition that you do not need a Rule 50A motion before a Rule 50B motion when you have a Rule 56 motion filed previously. That's exactly what happened in Ortiz. It was a case involving qualified immunity. There was a Rule 56 motion. The Supreme Court said you can make your Rule 56 basis reheard in a post-trial Rule 50B motion. That's exactly what we did. Am I wrong? There were no Rule 50 motions in Ortiz? I do not believe there was any Rule 50A motion. There was just an appeal from the denial of the pre-trial Rule 56 motion. I don't understand how it is that we can say with any certainty that Ortiz stands for the proposition stated here. Because Ortiz said specifically that you could... File a Rule 50B without previously having filed a Rule 50A. That's right. It said you could file a Rule 50B based upon your pre-trial Rule 56 motion. Plus, this court in Martinez-Moll didn't even, they just looked to the Rule 56 motion to determine whether the basis for the Rule 50B motion was raised. So this court and the Supreme Court has already recognized that you don't have, that you can look to the prior Rule 56 motion before you raise your Rule 50B motion. Plus, this court also talks about other pertinent portions of the record. And I would address, direct the court to Appendix 186 to 193. That was our joint pre-trial statement. And there are all of the things that we are claiming on this appeal are included. Plus, Your Honors, even if there was no... Before you move on, because I was looking in your brief for where these other references were and I couldn't find them. So what you just stated is where they are? That is some of those pages. It's actually in many places. And I thought in my brief that I did give you direct page numbers. But I know that this is Appendix 186 to 193 is a statement of the undisputed facts and the reasons why we would be entitled to judgment as a matter of law. Also, Your Honors, even if we weren't entitled to a Rule 50 motion, we still would be entitled to a new trial. And if we're going to get a new trial, there's no reason why we couldn't get a Rule 56 motion heard. And that's exactly what we did back then. We filed a Rule 59 motion with a renewed Rule 56 motion and a Rule 50b motion so that it wouldn't make sense for this court to have to remand back to the district court for another ruling on the summary judgment motion. Thank you. Thank you both.